**NOT FOR PUBLICATION**                                                                                     **CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANCIS BAGNATO : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | **OPINION** |
| : | Civ. Action No. 05-561 (WHW) |
| JO ANNE B. BARNHART : | |
| COMMISSIONER OF SOCIAL SECURITY, : | |
| : | |
| Defendant. : | |

**Walls, Senior District Judge**

Plaintiff Francis Bagnato ("plaintiff") seeks review of the final determination of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits pursuant to sections 216(i) and 223 of the Social Security Act. The Administrative Law Judge's decision to deny benefits is affirmed.

**BACKGROUND**

**A. Procedural History**

Plaintiff applied for disability insurance benefits on April 1, 2003. (R. at 62-64.) His application was denied initially and upon reconsideration. (R. at 40-42, 46-50.) Administrative Law Judge Michael J. Noorigan ("ALJ") held a hearing on July 21, 2004 to review plaintiff's application. (R. at 20-39, 56.) On August 11, 2004, the ALJ affirmed the decision of the Commissioner. (R. at 8-19.) He determined that plaintiff was not disabled within the meaning of the Social Security Act because there was insufficient evidence to establish a severe impairment. (R. at 11, 15.) Plaintiff's request for an appeals council review of the

1

**NOT FOR PUBLICATION**                                                                                                   **CLOSED**

determination was denied on December 1, 2004, and the ALJ's decision became the final decision of the Commissioner. (R. at 4-6, 7.) Plaintiff timely commenced this action.

**B. Personal and Employment History**

Plaintiff claims that he is disabled because he had brain surgery for a ruptured aneurysm in April 2001, and has been unable to work since his operation. (R. at 38, 88.) He is currently forty-six years old. (R. at 87.) Plaintiff has a ninth grade education and can speak, read and write English. (R. at 24, 62, 87.)

Plaintiff was a warehouse worker from 1975 to 2001. (R. at 24, 72.) From 1975 to 1976 he worked at a paper company, from 1976 to 1982 he worked at trucking companies, and from 1987 to 2001 he worked at a furniture company. (R. at 72.) He described his general work duties as operating equipment, loading and unloading trucks, lifting weight up to 100 pounds, and walking, standing, climbing or stooping for eight hours during the work day. (R. at 74-77.)

Plaintiff reported that his earnings were low in 1997 because he "didn't work that much" and low in 1998 because there was a slow period at work. (R. at 64.) Plaintiff did not have income in 1999 because he took a leave of absence from work for personal reasons and returned to work in 2000. (R. at 64.) Plaintiff testified that, in 2001, about a month before his ruptured aneurysm, he took time off from work because he was not feeling well. (R. at 24.) He also testified that after his surgery he returned to work in a warehouse but "kept getting dizzy and pains and taking time off," so he stopped working. (R. at 24.) He did not work in 2001 after April. (R. at 24.) Plaintiff testified that he worked less than one week in 2002 pumping and unloading trucks and earned $575.31. (R. at 24.)

Plaintiff claims that he constantly has head pains, dizziness, blurred vision and memory problems. (R. at 25, 31.) On the New Jersey Division of Disability Determination Services

NOT FOR PUBLICATION                                                                                          CLOSED

Headache Questionnaire, plaintiff reported having headaches all day everyday for two years and that just before getting a headache, he gets sick to his stomach. (R. at 97.) He reported that he did not take medication for his symptoms. Id. Plaintiff also reported that his headaches limit his daily activities because he cannot do anything when he has a headache; that his headaches occur on the left side of his head, where he had his surgery, and cause aching, crushing, stabbing and throbbing pains. (R. at 107.) Plaintiff testified at the ALJ hearing that he takes between six and ten Tylenol pills a day, and that the Tylenol eased the pain "some," but he has to sit down when in pain. (R. at 25.) He testified that after taking Tylenol, his pain went from eight, on a scale of one to ten, to between four and six. (R. at 26.) Plaintiff told the ALJ that he last saw a doctor, Dr. Rudzinsky, in October 2003. The doctor told plaintiff that there was not much the doctor could do for him because the doctor wanted to put a shunt in his head but his skin was too thin. (R. at 27, 28.)

     Plaintiff is divorced and has two children. (R. at 62-63.) At the time of the ALJ hearing, plaintiff had been living with his son for a "couple months here and there," and had also been living with his mother. (R. at 29, 32.) Plaintiff claims he does not do much and is in bed most of the time. (R. at 26, 98.) He testified that he sits around and reads books and newspapers. (R. at 27, 28.) He claims to get headaches after reading for forty-five minutes and "at times" has problems concentrating and remembering things. (R. at 29.) He also watches some television, listens to music and plays with his dog. (R. at 30, 32.) He testified that he suffers from dizziness and headaches within half an hour of bowling, playing basketball or attempting other activities he used to partake in. (R. at 26, 27.) He had tried these activities a "few" times after his surgery, but stopped. (R. at 27.)

**NOT FOR PUBLICATION**                                                                                       **CLOSED**

      Plaintiff claims he can walk ten blocks or for fifteen minutes before needing to stop or rest.  (R. at 100.)  He claims that he requires help filling out forms because he cannot concentrate on paperwork.  (R. at 101.)  Plaintiff's sister reported that he could not lift anything heavy or bend down.  (R. at 101.)  Plaintiff has not driven since his surgery.  (R. at 25.)  He attempted to drive once approximately seven months after his surgery, but kept swerving, so he stopped driving.  (R. at 26.)  He gets rides from his family and friends.  (R. at 26.)  Plaintiff can take care of his personal needs such as showering and dressing, but claims he gets dizzy.  (R. at 30.)  Plaintiff claims his sister does his shopping, cooking and cleaning.  (R. at 98-99.)  Plaintiff claims that "at times" someone has to go shopping with him because he gets dizzy while walking.  (R. at 30.)  However, plaintiff's son testified that he needs to accompany his father to places "all the time."  (R. at 35.)  Plaintiff's son also testified that plaintiff had trouble trying to clean the house and bathing the dog.  (R. at 33, 34.)

**C.  Medical History**

      On April 3, 2001 plaintiff was taken to the hospital after collapsing at work.  He was diagnosed with a ruptured aneurysm after a CT scan showed an acute subarachnoid hemorrhage and Dr. Charles Hunt, a neurosurgeon, operated on him at the UMDNJ University Hospital.  (R. at 132, 143.)  A CT scan from April 5, 2001 showed evidence of a subarachnoid hemorrhage, but no apparent parenchymal bleed or blood in the ventricles and no evidence of any infarction.  (R. at 129.)  When Dr. Hunt examined plaintiff for the last time on November 27, 2001, plaintiff complained of dizziness, headaches and blurred vision.  (R. at 131.)  Dr. Hunt found slight bilateral restrictions in visual fields.  Id.  Dr. Hunt noted in his report that a CT scan from May 16, 2001 was "ok" and recommended plaintiff follow up with another CT scan.  Id.

**NOT FOR PUBLICATION**                                                                                         CLOSED

      The next piece of medical evidence is from 2003.  X-rays from March 7, 2003 showed non-displaced fractures of the left sixth and seventh ribs at the level of the posterior axillary line. (R. at 151.)  His chest x-ray was normal.  Id.  On April 14, 2003, plaintiff went to the Jersey City Family Health Center.  He complained of rib pain beginning in January 2003 and continued headaches.  (R. at 152.)  He stated that he heard a "pop" when he coughed.  Id.  He reported that he was told (although the record is unclear by whom) that he had two broken ribs and possible cancer.  Id.  He also reported headaches, cough, and shortness of breath after walking five blocks.  (R. at 153.)  At that time, he reported that he was not taking any medications.  The left rib x-ray from this visit showed evidence of the rib fractures that appeared on the March 7, 2003 x-ray and that the fractures were healing.  (R. at 150.)  The rest of the physical examination did not show any abnormal signs and the doctor did not prescribe any medication or treatment for the fractured ribs.  (R. at 153-155.)

      Dr. Mills, a neurologist at the Jersey City Family Health Center, evaluated plaintiff on June 4, 2003.  (R. at 148.)  Dr. Mills reported that plaintiff continued to have headaches at the site of his surgery, plaintiff's headaches were sharp and constant, and plaintiff rated his headache pain as eight out of ten.  Id.  Dr. Mills also reported that plaintiff did not have nausea, vomiting or fever but plaintiff got dizzy when walking and had blurred vision.  Id.  He noted that plaintiff has had these symptoms after the surgery but not before.  Id.  Dr. Mills reported that plaintiff's visual acuity was decreased on both sides.  Id.  He also noted that plaintiff had slight dizziness on standing.  Id.  Dr. Mills reported that plaintiff's cranial nerves were intact.  Id.  Dr. Mills diagnosed plaintiff as "headaches status post-surgery and dizziness ruled out vasovagal."  Id.  Dr.

NOT FOR PUBLICATION                                                                                      CLOSED

Mills referred plaintiff to an ophthalmology consult.  Id.  Plaintiff was discharged and told to return on an as needed basis.

At the request of Disability Determination Services, Dr. Jaspreet Kaur conducted a consultative examination on June 25, 2003.  Dr. Kaur made the following report:

> History: . . . At present, the patient complains of feeling dizzy and having headaches . . . .  He says he feels dizzy whenever he exerts himself physically, for example, if he does any lifting, bending, walking.  The episodes occur once or twice a week and are worse with physical activity described above.  The patient never falls down, has not lost consciousness.  He only gets the feeling of dizziness accompanied by the feeling of being off-balance.
>
> The patient also complains of headaches which occur throughout the day.  They are throbbing in nature, usually frontal and left temporal.  Patient takes 2 to 8 Tylenol q. day for above.  The patient has discussed it with his private M.D. who did a MRI and further workup on him and he was told that nothing can be done for these headaches, nothing further can be done for these, he claims.
>
> . . .
>
> Medications: Medications he is on include Tylenol.
> Review of Systems: Is positive for headaches, dizziness, difficulty seeing.  He says that his vision has become bad after surgery.  He also claims he has memory loss.
> Medications: The patient takes Tylenol 2 to 8 a day as needed, p.r.n.
>
> Physical Exam: . . . Vision left eye 20/25, right 20/20, both eyes 20/20 without glasses.  He does not use any glasses at present.  There seemed to be no apparent loss of short or long-term memory. . . Romberg sign is negative. . .
>
> Assessment and plan: The patient is a 43-year-old male, status post surgery for ruptured aneurysm, April 2001, with symptoms of headaches and dizziness under neurosurgery follow up.

(R. at 132-34.)

The final piece of medical evidence is a progress note from the Jersey City Family Health Center on October 7, 2003.  Plaintiff was seen for a follow-up on his complaints of headaches and dizziness.  (R. at. 124.)  Dr. Rudzinsky reported plaintiff as status post surgery for ruptured

NOT FOR PUBLICATION                                                                                          CLOSED

aneurysm. Id. He also reported that Tylenol alleviated plaintiff's headaches and that plaintiff took six to eight pills a day. Id. Plaintiff complained of dizziness and loss of balance but denied blurred vision, vomiting, and chest pain. Id. Physical examination revealed no remarkable findings. Id. Dr. Rudzinsky reported that plaintiff's cranial nerves were intact, Romberg test was negative and plaintiff had no nystagmus. Id. Dr. Rudzinsky advised plaintiff to follow up at the neurological clinic. Id.

**STANDARDS**

**A. Standard of Review**

This Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g). The Court must affirm the Commissioner's decision if it is "supported by substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Metro Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). While substantial evidence must have real probative weight, it "may be less than a preponderance." Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988)).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner's] decision is not supported by substantial evidence.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981)). Cursory conclusions unsupported by evidence cannot justify an ALJ's decision. Id. "[A]

NOT FOR PUBLICATION                                                                                    CLOSED

reviewing court may remand a case to the Secretary for good cause, 'where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits.'" Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979) (quoting Saldana v. Weinberger, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)).

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) objective medical facts; (2) diagnoses and expert opinions of examining physicians; (3) subjective evidence of pain; and (4) the claimant's educational background, work history and age." Snee v. Sec'y of Health & Human Servs., 660 F. Supp. 736, 738 (D.N.J. 1987); accord Balock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972). In order for this Court to properly conduct judicial review and to avoid "judicial usurpation of administrative functions," it must ensure that the "administrative decision . . . [is] accompanied by a clear and satisfactory explanation of the basis on which it rests." Id.  Otherwise, remand is appropriate. Cotter v. Roberts, 642 F.2d 700, 705 (3d Cir. 1981).

**B**.  **Standard for the Commissioner's Determination of Disability**

Disability is defined by the Social Security Act as "inability to engage in any substantial gainful activity by any reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner must follow a five-step sequential process to determine if an applicant is disabled and eligible for Social Security disability benefits. 20 C.F.R. § 404.1520. The Commissioner must first determine whether or not the claimant is currently engaged in "substantial gainful activity." Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). "Substantial

NOT FOR PUBLICATION                                                                                          CLOSED

gainful activity" is defined as "the performance of significant physical or mental duties . . . for remuneration or profit."  Chicager v. Califano, 574 F.2d 161, 163 (3d Cir. 1978).

Second, if the claimant is not engaged in "substantial gainful activity" the ALJ must next determine if the claimant is suffering from a "severe impairment."  Plummer, 186 F.3d at 428.  A severe impairment is defined as "any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities."  Barnhart v. Thomas, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(c), 416.920(c).

Third, if the claimant's impairments are severe, the ALJ must determine whether they are listed in Appendix 1 to subpart P of the regulations or are equivalent to the impairments listed there.  Plummer, 186 F.3d at 428; 20 C.F.R. § 404.1520.  If the impairments are not listed or equivalent to those listed in the appendix, the ALJ must make a fourth finding regarding the claimant's "residual functional capacity to perform" his or her "past relevant work."  Id. "Residual functional capacity is defined as what a claimant can still do despite his limitations."  Burns, 312 F.3d at 119.

If the ALJ holds that the claimant cannot return to his or her "past relevant work" due to the impairments, then the ALJ must determine if there are "other jobs existing in significant numbers in the national economy which the claimant can perform," taking into account his or her educational and work experiences.  Plummer, 186 F.3d at 428.

**ANALYSIS**

The ALJ denied plaintiff benefits at step two of the analysis because "there was insufficient evidence to medically establish a severe impairment that met the durational requirement" based on the Commissioner's medical expert report.  (R. at 15.)  The ALJ found that

9

NOT FOR PUBLICATION                                                                                    CLOSED

because Dr. Rudzinsky's neurological examination was negative, the Disability Determination Service ("DDS") assessment was entitled to "great weight." Id. Based on Social Security Regulation 96-4p, the ALJ found that complaints of constant and severe headaches were not enough in the absence of "the requisite medically determined impairments." Id.

The ALJ made four findings. (R. at 15.) First, he found that plaintiff met the nondisability requirements set forth in Section 216(i) of the Social Security Act and was insured for benefits through the date of the ALJ decision. Id. Second, he found that plaintiff was not engaged in substantial gainful activity since the alleged onset of his disability. Id. Third, he found that plaintiff had no medically determined impairment that met the durational requirement of the Act. (R. at 16.) Fourth, he found that plaintiff was not under "disability," as defined by 20 C.F.R. § 404.120(c), through the date of the ALJ decision.

Plaintiff makes two challenges to the ALJ's decision. (Pl.'s Br. at 4.) First, he claims that the ALJ's decision was not based on substantial evidence of record. Id. Second, he claims that the record contains substantial evidence to support a disability finding. Id.

The Court finds that the ALJ had sufficient evidence to determine that plaintiff did not have a severe impairment. Although claimant undisputedly suffered a ruptured aneurysm and underwent brain surgery, his medical records do not indicate any severe impairments. According to the legislative history of the Social Security Act, "Section 423(d)(2)(A) was intended to 'reemphasize the predominant importance of medical factors in the disability determination.'" Bowen v. Yuckert, 482 U.S. 137, 148 (1987). "If a claimant is unable to show that he has a medically severe impairment, he is not eligible for disability benefits. In such a case, there is no reason for the Secretary to consider the claimants age, education and work experience." Id.

**NOT FOR PUBLICATION**                                                                                          CLOSED

Plaintiff argues that the ALJ must make specific findings when evaluating a claimants subjective pain. (Pl's Br. at 16.) The Court does not find this argument persuasive because "allegations of pain and other subjective symptoms must be supported by objective medical evidence." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). In this case, there was substantial evidence for the ALJ to find that the record did not indicate plaintiff's symptoms were supported by objective medical evidence. An ALJ should evaluate the intensity and persistence of a claimant's symptoms if there are medical signs and laboratory findings which show a medical impairment that could reasonably be expected to produce the alleged pain and other symptoms. See 20 C.F.R. § 416.929(a). Because plaintiff's physicians did not link his complaints to a medical diagnosis, the ALJ did not need to evaluate the intensity and persistence of plaintiff's symptoms. The Commissioner's argument that plaintiff is not severely impaired because he is not taking any prescription medications and that a claimant may suffer pain, but not meet the disability test, has merit. (See Commissioner's Br. at 9-10.)

"A symptom is not a 'medically determinable physical or mental impairment' and no symptom by itself can establish the existence of such an impairment." SSR 96-4p (1996).

> In the absence of a showing that there is a 'medically determinable physical or mental impairment,' an individual must be found not disabled at step 2 of the sequential evaluation process. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment.

Id. Symptoms are defined by the Social Security regulations as an individual's own description of his physical or mental impairment. 20 C.F.R. § 404.1528 (2006). These "statements alone are not enough to establish that there is a physical or mental impairment." Id. Signs are defined as

11

NOT FOR PUBLICATION                                                                                    CLOSED

"anatomical, physiological, or psychological abnormalities which can be observed, apart from [a claimant's] statements (symptoms).  Signs must be shown by medically acceptable clinical diagnostic techniques."  Id.  Laboratory findings are defined as "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques.  Id.  Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc), roentgenological studies (X-rays), and psychological tests."  Id.

To determine disability, the Social Security Administration considers all of a claimant's symptoms, including pain, to the extent which the claimant's symptoms can "reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529.  However, when a claimant's record does not reflect findings of an impairment but only the claimant's "perception and description" of his own problems, termination of process at step two is justified based on the SSR 96-4p standard.  See Ukolov v. Barnhart, 420 F.3d 1002, 1005-06 (9th Cir. 2005); Jaquez v. Barnhart, No. 04-3103 slip op. at *5 (N.D. Ill. Sept. 1, 2005).

The United States Court of Appeals for the Third Circuit has affirmed the denial of social security benefits to claimants whose main symptom is headaches.  In DeCarlo v. Barnhart, that Court held that the plaintiff's headaches did not meet the burden of severe impairment at step two.  116 F. App'x. 387, 390 (3d Cir. 2004).  The Court found that the ALJ had substantial evidence in denying benefits because at least four physicians and various occupational and physical therapists evaluated the plaintiff, and noted her complaints of headaches, but "*none* of them indicated the headaches affected DeCarlo's ability to work" and neither claimant's treating physician nor her examining physician "placed specific restrictions upon DeCarlo despite her

12

NOT FOR PUBLICATION                                                                        CLOSED

complaints about headaches." Id. (emphasis in original).  Although DeCarlo does not have precedential value, it is persuasive because of the factual similarities to this case.  The present plaintiff was not given prescription medication by any of the doctors despite his repeated complaints, nor did his physicians place him on any restrictions.

The Third Circuit has also affirmed the denial of benefits to a plaintiff whose headaches worsened after an automobile accident, but who was unable to substantiate the severity of his headaches other than through his own testimony.  Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).  The claimant reported that Fiorinal, a prescription medication, provided temporary relief. Id.; see also Page v. Barnhart, 108 F. App'x. 735, 738 (3d Cir. 2004) (finding the report of headaches eleven years after surgery and testimony that prescription medication alleviates pain does not indicate more than minimal impact); Mearing v. Barnhart, 88 F. App'x. 148, 149-50 (8th Cir. 2004) (finding that headaches were not severe where claimant's physician recommended only over-the-counter medication and there was no evidence claimant sought treatment for headaches or was denied treatment for lack of funds).

There is also substantial evidence in the record that plaintiff's complaints of dizziness and blurred vision do not constitute severe impairments.  Although Dr. Hunt diagnosed plaintiff with restricted vision in bilateral fields and Dr. Mills diagnosed plaintiff with decreased visual acuity (R. at 131, 148), plaintiff's capacity for seeing is not significantly limited.  See 20 C.F.R. § 404.1521.  Plaintiff does not need glasses and he can read or watch television without vision problems.  Several Courts of Appeals have affirmed the denial of disability to claimants with limited vision.  See Johnson v. Barnhart, No. 05-3797, 2006 WL 1520067, at *1 (7th Cir. June 5, 2006)  (finding although claimant had inflammation of her eyes that caused intermittent

13

NOT FOR PUBLICATION                                                                          CLOSED

blurriness, she had 20/20 vision and her condition did not prevent her from reading); Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001) (finding doctor's opinion should not have controlling weight because doctor accepted complaint of blurred vision at face value "even though repeated ophthalmology exams failed to show any significant abnormalities").

Plaintiff argues that his brain surgery constitutes a severe impairment. (Pl.'s Br. at 8.) This argument does not have merit because surgery does not necessarily "significantly limit [a claimant's] physical or mental ability to do basic work activities" for a period of time meeting the durational requirement. See 20 C.F.R. 404.1521(a). "The law defines disability as the inability to do any substantially gainful activity by reason of any medically determinable physical . . . impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. 404.1505(a). Plaintiff's surgery, if considered a medically determinable impairment, did not result in death and did not last for twelve months. While surgery may cause "medically determinable" impairments, the plaintiff's medical record does not indicate any in this case.

Although plaintiff has made numerous complaints of headaches, dizziness and blurred vision since his brain surgery, these complaints are not supported by objective medical evidence. Accordingly, substantial evidence supports the ALJ's decision that plaintiff does not demonstrate a severe impairment.

**CONCLUSION**

For the foregoing reasons, the Commissioner's decision is affirmed.

s/William H. Walls
United States Senior District Judge
